# Exhibit "A"

ASSET PURCHASE AGREEMENT

BETWEEN

WORLEY & OBETZ, INC.

AND

J. W. BISHOP, INCORPORATED T/D/B/A BISHOP FUELS

3837337_6

TABLE OF CONTENTS

Article I SALE OF ASSETS ....................................................................................................1
  1.1    Sale of Assets................................................................................................1
  1.2    Excluded Assets............................................................................................2
  1.3    Deposit.........................................................................................................2
  1.4    Purchase Price...............................................................................................2
  1.5    Payment of Purchase Price ..........................................................................2
  1.6    Allocation of Purchase Price.........................................................................3
  1.7    Assumption of Liabilities..............................................................................3
  1.8    Conveyance and Transfer; Assumption .......................................................4
  1.9    Closing Date .................................................................................................4
Article II REPRESENTATIONS AND WARRANTIES OF SELLER.................................5
  2.1    Existence, Good Standing and Authority .....................................................5
  2.2    Authority, No Violation................................................................................5
  2.3    Title to Assets ..............................................................................................5
  2.4    Condition of Assets......................................................................................5
  2.5    Sales Volume ...............................................................................................5
  2.6    Customer List ...............................................................................................5
  2.7    Inventory......................................................................................................5
  2.8    Financial Statements ....................................................................................5
  2.9    Absence of Changes.....................................................................................6
  2.10   Material Contracts........................................................................................6
  2.11   No Conflict ..................................................................................................7
  2.12   Litigation .....................................................................................................7
  2.13   Tax Returns and Payments...........................................................................7
  2.14   Property and Casualty Insurance...................................................................7
  2.15   Employee Benefit Plans. ..............................................................................8
  2.16   Intellectual Property.....................................................................................8
  2.17   Environmental Matters .................................................................................8
  2.18   Underground Storage Tanks..........................................................................8
  2.19   Labor Matters ..............................................................................................9
  2.20   Broker's or Finder's Fees..............................................................................9
Article III REPRESENTATIONS OF PURCHASER .........................................................9
  3.1    Existence and Good Standing of Purchaser ..................................................9
  3.2    Power and Authority.....................................................................................9
  3.3    No Conflict ..................................................................................................9
  3.4    Litigation.....................................................................................................10
  3.5    Broker's or Finder's Fees .............................................................................10
Article IV OTHER COVENANTS .....................................................................................10
  4.1    Interim Operations of the Company .............................................................10
  4.2    Cooperation..................................................................................................11
  4.3    Employees....................................................................................................11
  4.4    Confidentiality .............................................................................................12
  4.5    Notice of Certain Events Regarding Liabilities.............................................12
  4.6    Inspections and Investigations .....................................................................12

4.7    Covenant Not to Compete and Non-Solicitation. ...........................................................12
Article V ENVIRONMENTAL MATTERS ...........................................................................................14
5.1    Allocation of Responsibility. ..........................................................................................14
5.2    Cleanup for Pre-Closing Environmental Conditions. .....................................................15
5.3    Environmental Reports ....................................................................................................15
Article VI INDEMNIFICATION REMEDIES .....................................................................................15
6.1    Survival ............................................................................................................................15
6.2    Definitions. For purposes of this Article: .......................................................................16
6.3    Indemnification by Seller .................................................................................................16
6.4    Indemnification by Purchaser .........................................................................................16
6.5    Miscellaneous ..................................................................................................................17
6.6    Time Limitations ..............................................................................................................17
6.7    Procedure for Indemnification. .......................................................................................17
Article VII CONDITIONS TO CLOSING ...........................................................................................18
7.1    Conditions to Each Party's Obligation to Effect the Closing .........................................18
7.2    Conditions to Obligations of Purchaser to Effect the Closing ........................................18
7.3    Conditions to Obligations of Seller to Effect the Closing ..............................................18
Article VIII miscellaneous ....................................................................................................................19
8.1    Termination of Agreement ...............................................................................................19
8.2    Return of Documents .......................................................................................................19
8.3    Limitations on Remedies .................................................................................................19
8.4    Expenses ..........................................................................................................................19
8.5    Governing Law ................................................................................................................19
8.6    Captions; References ........................................................................................................20
8.7    Variation in Pronouns, Etc ...............................................................................................20
8.8    Notices .............................................................................................................................20
8.9    Parties in Interest .............................................................................................................21
8.10    Counterparts ...................................................................................................................21
8.11    Entire Agreement ...........................................................................................................21
8.12    Amendments ...................................................................................................................21
8.13    Severability ....................................................................................................................21
8.14    Third Party Beneficiaries ...............................................................................................21
8.15    Publicity and Disclosures ...............................................................................................21
8.16    Waiver ............................................................................................................................21
8.17    Bulk Sales Law ...............................................................................................................22
Article IX DEFINITIONS ....................................................................................................................22

## ASSET PURCHASE AGREEMENT

Made March 4, 2013 (the "**Effective Date**") by and among **WORLEY & OBETZ, INC.**, a Pennsylvania Corporation ("**Purchaser**") and **J. W. BISHOP COMPANY, INCORPORATED t/d/b/a BISHOP FUELS**, a Pennsylvania corporation ("**Seller**").

### Background

WHEREAS, Seller is engaged in the business of the retail and wholesale sale and distribution of home heating oil and related products and services and the sale and servicing of HVAC equipment and general transportation (the "**Business**");

WHEREAS, Seller desires to sell, and Purchaser desires to purchase the assets of the Business;

NOW, THEREFORE, in consideration of the promises and mutual representations, warranties, covenants and agreements of the parties hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereby agree as follows:

### ARTICLE I  SALE OF ASSETS

1.1     Sale of Assets.  Upon the terms and subject to the conditions contained in this Agreement, at the Closing (as defined in Section 1.9 below), Seller shall sell, assign, transfer and convey to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, all of the assets of Seller used in the Business (the "**Assets**"), including, but not limited to:

(a)     The furnishings, fixtures, leasehold improvements, office equipment, computers, computer peripherals, software, above ground tanks, tank equipment, tools and other machinery and equipment of Seller used in connection with the conduct of the Business, including, without limitation, the machinery and equipment listed on Schedule 1.1(a) (the "**Equipment**");

(b)     The office supplies, advertising and marketing materials and supplies, and other operating supplies (the "**Operating Supplies**");

(c)     The motor vehicles and tank wagons of Seller listed on Schedule 1.1(c) (the "**Vehicles**");

(d)     The trademarks, trade names, service marks and trademark applications and other intellectual property listed on Schedule 1.1(d) (the "**Intellectual Property**");

(e)     Seller's useable, non-obsolete inventory of home heating, ventilating and air conditioning equipment and parts which is on hand on the Closing Date ("**Parts Inventory**");

(f)     Seller's inventory of home heating oil and other petroleum products held for sale to customers which is on hand on the Closing Date (the "**Liquid Inventory**");

(g)     All rights and benefits under the Contracts listed on Schedule 1.1(g) (the "**Assumed Contracts**");

(h)     All of the goodwill of the Business, including all retail and wholesale customer lists, customer records and data, sales and marketing information and other books, records and information of Seller relating to the Business, phone numbers and facsimile numbers, the name Bishop Fuels and any other derivations of the same.

(i)     All Governmental Authorizations held by Seller which relate to the Business, to the extent transferable;

(j)     All Prepaid Expenses of the Business on the Closing Date.

1.2     Excluded Assets. Notwithstanding any provision contained herein to the contrary, the Assets shall not include:

(a)     All cash and cash equivalents of the Seller;

(b)     Seller's minute and stock record books, journals, ledgers and books of original entry; and

(c)     Accounts receivable.

1.3     Deposit. Purchaser has previously placed a deposit with Tioga State Bank ("**Escrow Agent**") of One Hundred Thousand Dollars ($100,000.00) (the "**Deposit**"). Escrow Agent shall deposit the money in an interest bearing escrow account. At Closing, the Deposit and any interest thereon shall be transferred to the Seller and credited towards the Purchase Price (as defined herein). If this Agreement is terminated due to a breach of this Agreement by Purchaser, the Deposit shall be transferred to Seller. If the Agreement is terminated for any other reason, at such termination, the Deposit shall be returned to Purchaser.

1.4     Purchase Price. The purchase price for the Assets (the "**Purchase Price**") is One Million Eight Hundred Twenty-Two Thousand Dollars ($1,822,000.00) plus:

(a)     the weighted average laid in cost by product on the Closing Date for the Liquid Inventory (the "**Liquid Inventory Purchase Price**"); and

(b)     the value of the Parts Inventory valued at Seller's cost (the "**Parts Inventory Purchase Price**").

1.5     Payment of Purchase Price. At Closing, the Purchase Price shall be paid as follows:

(a)     One Million Three Hundred Twenty-Two Thousand Dollars ($1,322,000.00) (less the Deposit) by cash or check;

3837337_6

2

(b)     Five Hundred Thousand Dollars ($500,000.00) by delivery of the Purchaser's two promissory notes, each for $250,000.00, in form substantially similar to Exhibit A attached hereto (the "**Notes**");

(c)     The sum of the Liquid Inventory Purchase Price plus the Parts Inventory Purchase Price, less the "Prepayment Amounts" (as defined below) paid by cash or check at Closing.

1.6     Allocation of Purchase Price.  Purchaser and Seller agree that the Purchase Price shall be allocated among the Assets as set forth on Schedule 1.6 attached hereto, and such allocation shall be consistently reported by Purchaser and Seller on Internal Revenue Form 8594.

1.7     Assumption of Liabilities.

(a)     Purchaser does not and shall not assume or agree to assume the liabilities and obligations of Seller or the Business of any nature, direct, contingent or otherwise, except the following obligations, which are hereinafter referred to as the "Assumed Liabilities":

(i)     Obligations of Seller to any customers with respect to pre-payments by such customers to Seller.  On or before Closing, Seller shall provide a schedule of customer pre-payments (the "**Pre-Payment Amount**").  The Pre-Payment Amount will be deducted at Closing from the Liquid Inventory and Parts Inventory Purchase Price being paid at Closing;

(ii)     Obligations of Seller arising on and after the Closing Date under contracts with retail customers for the future purchase of home heating oil or other liquid fuels which have been entered into in the ordinary course of the conduct of the Business by Seller and identified on Schedule 1.1(g) as an Assumed Contract; and

(iii)     Liabilities and obligations arising on or after the Closing Date with respect to performance under the other Assumed Contracts.

(b)     Except for the Assumed Liabilities, Purchaser shall not assume or be bound by any obligations or liabilities of Seller or the Business of any kind or nature, known, unknown, accrued, absolute, contingent or otherwise, whatsoever, all of which shall be retained by Seller (the "**Retained Liabilities**").  The Retained Liabilities include, without limitation:

(i)     All liabilities and obligations arising in connection with or on the basis of events, acts, omissions, conditions or any other state of facts relating to the Business or the Assets occurring or existing prior to or on the Closing Date (including, in each case, without limitation, product liability matters, Environmental Claims, Environmental Expenses and/or Environmental Conditions claimed by any third party, including pre-closing customers of Seller, tax matters, pension and benefit matters, any failure on or before the Closing Date

3837337_6                                              3

to comply with applicable laws and/or permitting or licensing requirements, bodily injury and property damage matters and worker health and safety matters);

(ii)    Any Trade Payables;

(iii)    Wages, employee benefits and other compensation due to Seller's employees with respect to any period prior to the Closing Date;

(iv)    Any Taxes of Seller or the Business based on any activity of Seller or the Business (other than prepaid real estate taxes);

(v)    Any employee benefits plans maintained by Seller or its Affiliates;

(vi)    Liabilities and obligations for Pre-Closing Environmental Conditions; and

(vii)    Liabilities and obligations relating to the Excluded Assets.

1.8    Conveyance and Transfer: Assumption. At the Closing, and subject to the terms and conditions hereof, Seller shall execute and deliver to Purchaser and Purchaser shall execute and deliver to Seller, bills of sale, assignments and such other good and sufficient instruments of transfer, assignment, and conveyance and assumption, in form satisfactory to Purchaser and Seller and their counsel, as shall be effective to convey to Purchaser good and merchantable title in and to the Assets and to cause Purchaser to assume the Assumed Liabilities. Simultaneously with such delivery, Seller will take all steps necessary to put Purchaser in actual possession of the Assets. Following the Closing, Seller will execute and deliver to Purchaser such other and further instruments of conveyance, assignment and transfer and take such other action, none of which shall be inconsistent with the terms hereof, as Purchaser may reasonably require to more effectively convey, transfer, and assign to Purchaser and to put Purchaser in possession of, the Assets, and Purchaser shall execute and deliver to Seller such other and further instruments of assumption and take such other action, none of which shall be inconsistent with the terms hereof, as Seller may reasonable require to confirm Purchaser's assumption of the Assumed Liabilities.

1.9    Closing Date. The Closing under this Agreement (the "**Closing**" or "**Closing Date**") shall be held on or before March 4, 2013. The Closing shall be held at a location in Scranton, Pennsylvania designated by the Purchaser, at 9:00 a.m. on such date, or at such other time and place as Purchaser and Seller may agree upon in writing. At the Closing, Purchaser and Seller shall furnish the documents, instruments, and certificates required under the provisions of this Agreement in form reasonably acceptable to the parties hereto and such other documents necessary or desirable to consummate the transactions contemplated herein as the parties hereto may reasonably request.

## ARTICLE II  REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as follows:

2.1    Existence, Good Standing and Authority. Seller is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania. Seller has the power to own its properties and to carry on the Business as now being conducted.

2.2    Authority, No Violation. Seller has all requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated hereby. The execution, delivery and performance of this Agreement by Seller has been duly and validly authorized and approved by all necessary corporate action by Seller. This Agreement constitutes the legal and binding obligation of Seller enforceable against it in accordance with its terms, subject to applicable laws of bankruptcy, insolvency, moratorium and other laws affecting the rights of creditors generally and to general principles of equity.

2.3    Title to Assets. On or before Closing, Seller will have good and marketable title to all Assets, free and clear of all Encumbrances and the sale and delivery of the Assets to Purchaser pursuant hereto shall vest in Purchaser good and marketable title thereto, free and clear of any and all Encumbrances.

2.4    Condition of Assets. Except for ordinary wear and tear, all of the Assets are in good working order, including, but not limited to, all of the Vehicles are, or will be at Closing, Pennsylvania state inspected. The Assets comprise all of the assets used by the Seller in the conduct of the Business. Purchaser shall pay for sales tax and related transfer costs for the transfer of the Vehicles at Closing.

2.5    Sales Volume. Attached hereto as Schedule 2.5 is a true and correct listing of sales volume, month-to-month for calendar years 2009, 2010 and 2011 for No. 2 fuel oil.

2.6    Customer List. Attached hereto as Schedule 2.6 is a true and correct copy of the customer list of Seller (the "Customer List"). At least one day before Closing, after the close of business, Seller will electronically back up its customer list and related accounting programs and provide an electronic and hard copy version to the Purchaser of the same at Closing.

2.7    Inventory. All of the Liquid Inventory and Parts Inventory sold to the Purchaser at the Closing will be of merchantable quality, not obsolete and salable at the Seller's regular prices (or, in the case of supplies and stock-in-trade, usable) in the ordinary course of the Business. All product labels and descriptions of the Seller conform in all respects with (a) all Laws applicable thereto, (b) all product information and product descriptions used by the Seller, and (c) all applicable accepted industry standards.

2.8    Financial Statements. The Seller has heretofore delivered to the Purchaser the financial statements for (a) the fiscal years ended December 31, 2010 and 2011, reviewed by Mengel Metzger Barr & Co., LLP, the Seller's independent public accountants and (b) management-prepared financial statements for the interim period ended December 31, 2012 (collectively, the "Financial Statements"). The Financial Statements have been prepared on a basis consistent with and in accordance with the provisions of generally accepted accounting

principles, applied on a consistent basis through the periods indicated, and fairly present the
financial condition and results of operations of the Seller as of the dates and during the periods to
which they relate. Except as reflected and reserved on the Financial Statements, the Seller does
not have any liability or obligation of any nature relating to the Assets or the Business whether
accrued, contingent, absolute or otherwise which existed as of the date of the Financial
Statements, which would result in a claim or lien upon the Assets or otherwise impair any right
of the Purchaser to the Assets.

    2.9    Absence of Changes.  Since the dates of the Financial Statements: (a) the Seller
has conducted the Business in the regular and ordinary course; (b) there has been no loss,
damage or destruction (or possible threat thereof) to the Assets whether or not covered by
insurance; (c) no bonuses or raises have been granted except pursuant to a prior plan or
established practice, and the same are fully reflected on the Seller's books or have been fully
disclosed to the Purchaser; (d) there has been no material adverse change in the assets, liabilities,
business, financial condition, operations, results of operations or future prospects of the
Business; and (e) no event has occurred which would be prohibited by Section 4.1 herein.

    2.10   Material Contracts.

        (a)    Schedule 2.10 is a complete list of all of the following Contracts to which
Seller is a party or by which it is bound:

            (i)    all Contracts for the purchase, sale, construction, lease or licensing
    of the Real Estate or any other real property employed in conduct of the Business,
    or granting any option to purchase, sell, lease or license any other real property
    employed in conduct of the Business;

            (ii)    all Contracts which create or authorize any Encumbrance on any of
    the Assets or a list of all such Encumbrances, including the lien holder, amount
    outstanding and any other information reasonably requested by the Purchaser;

            (iii)    any other contract pertaining in any respect to the Business or the
    Assets which (x) is not terminable without penalty on notice of thirty (30) days or
    less, and (y) may involve payment by the Seller of more than $5,000 in any year
    or more than $25,000 over the term of any Contract; and

            (iv)    any other contract pertaining to locked-in pricing to either provide
    or purchase any liquid inventory at a set price.

        (b)    Each Contract set forth on Schedule 2.10 is a valid and binding agreement
of Seller and of all other parties thereto and is in full force and effect and enforceable in
accordance with its terms, subject to applicable laws of bankruptcy, insolvency,
moratorium and other laws affecting the rights of creditors generally and to general
principles of equity.  To the Knowledge of Seller, there exists no default or event of
default under any of the Contracts set forth on Schedule 2.10 or any event, occurrence,
condition or act (including the purchase of the Assets hereunder) which, with the giving
of notice, the lapse of time or the happening of any other event or condition, would

become a default or event of default thereunder.  True and complete copies of all such Contracts have been provided to Purchaser by Seller.

2.11   No Conflict.

(a)     Neither the execution and delivery of this Agreement nor the consummation or performance of the transactions contemplated hereby will, directly or indirectly (with or without notice or lapse of time):

(i)     contravene, conflict with, or result in a violation of any provision of the Organizational Documents of Seller;

(ii)     contravene, conflict with, or result in a violation of, any Legal Requirement, Governmental Authorization, or any Order to which Seller or any of the Assets are bound or subject;

(iii)     Contravene, conflict with, or result in a violation or breach of any provision of, or accelerate the maturity or performance of, or cancel, terminate, or modify, any Contract; or

(iv)     result in the imposition or creation of any Encumbrance upon or with respect to any of the Assets.

(b)     Seller is not required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the transactions contemplated hereby.

2.12   Litigation.  Except as set forth on Schedule 2.12, there is no proceeding, investigation or litigation by any Person, or by or before any Governmental Body, pending or threatened, against or affecting (i) Seller, the Business, the Assets or the Assumed Contracts, or (ii) the transactions contemplated hereby.  Seller is not subject or a party to any Order.

2.13   Tax Returns and Payments.

(a)     Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, consultant, independent contractor, creditor, stockholder, or other third party.

(b)     No liability for any Tax will be imposed upon or asserted against the Assets or Purchaser or Purchaser's other assets with respect to any period before the Closing Date.  No deficiency assessment or proposed adjustment for Taxes is pending against Seller, and Seller has no Knowledge of any liability, whether or not proposed, for any Tax with respect to any period through the date hereof to be imposed upon any of its properties or assets for which Seller has not made an adequate reserve.  Seller is not aware of any dispute or claim concerning any liability for Taxes of Seller.

2.14   Property and Casualty Insurance.  Seller has maintained, and as of the date hereof has in effect, such policies of motor vehicle, property, workers' compensation, general liability

and other insurance as are required by law and are adequate and appropriate with respect to the Business. Set forth on Schedule 2.14 is a complete list of all insurance policies ("**Insurance Policies**") which Seller maintains with respect to the Business, the Assets or employees, which Insurance Policies are legal, valid, binding, enforceable and in full force and effect. To the Knowledge of Seller, Seller has not violated any of the terms or conditions of the Insurance Policies and is not otherwise in default thereof. To the Knowledge of Seller, all of the terms and conditions to be performed by the issuers of the Insurance Policies have been fully performed, and no party to any of the Insurance Policies has repudiated any provision thereof. All Insurance Policies are written on an "occurrence", and not a "claims made," basis.

2.15   Employee Benefit Plans.

(a)   Schedule 2.15 sets forth a complete and correct list of all material "employee benefit plans," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), maintained, or contributed to, by Seller on behalf of any employee, officer or director of Seller and all material written bonus or other incentive compensation, deferred compensation, salary continuation, disability, stock award, stock option, stock purchase, severance, parachute or other material employee benefit policies or arrangements which Seller maintains or contributes to on behalf of any employee, officer or director of Seller (collectively referred to as the "Plans").

(b)   Seller has not taken any action that may result in Purchaser being a party to, or bound by, any Plan, and Purchaser shall have no liability under, or be subject to any liability on account of, any Plan following consummation of the Transactions.

(c)   No Plan or other employment arrangement of Seller has provided for the payment of retiree benefits by Purchaser.

2.16   Intellectual Property. Schedule 1.1(d) sets forth a list of all Intellectual Property owned, licensed to or used by Seller that is material to the Business, and with respect to which Seller possesses legally enforceable rights. Seller owns each service mark, trademark, trade name, brand name, patent and application therefor listed on Schedule 1.1(d). To the Knowledge of Seller, the conduct of the Business does not infringe any intellectual property rights of any Person, and Seller has not received any written notice from any other Person pertaining to or challenging the right of Seller to use any of the Intellectual Property.

2.17   Environmental Matters. Seller has complied with all applicable Environmental Laws relating to the Assets. There is no pending or, to the knowledge of Seller, threatened civil or criminal litigation, written notice of violation, formal administrative proceeding, or investigation, inquiry or information request by any Governmental Agencies, relating to any Environmental Law relating to the Assets.

2.18   Underground Storage Tanks. To the Knowledge of Seller, there are no underground storage tanks, pits, sumps or impoundments (as defined under Environmental Law) located on or under the Real Estate.

2.19    Labor Matters. Seller is not (i) a party to or bound by any collective bargaining agreement with a labor union or labor organization, (ii) a party to or bound by any contract for the employment of any employees of Seller, or (iii) the subject of any proceeding asserting that the Seller has committed an unfair labor practice or is seeking to compel it to bargain with any labor organization as to wages or conditions of employment.

2.20    Broker's or Finder's Fees. Neither Seller nor any of or its Affiliates has entered into any agreement or arrangement entitling any agent, broker, investment banker, financial advisor or other Person to any broker's or finder's fee or any other commission or similar fee in connection with any of the Transactions.

## ARTICLE III   REPRESENTATIONS OF PURCHASER

Purchaser represents and warrants to Seller as follows:

3.1    Existence and Good Standing of Purchaser. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania.

3.2    Power and Authority. Purchaser has the legal right, power and authority to make, execute, deliver and perform this Agreement. This Agreement has been duly authorized and approved by all required action of Purchaser. Purchaser has taken all actions required by Legal Requirements, Purchaser's Organizational Documents or otherwise, to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder. This Agreement has been duly executed and delivered by Purchaser and constitutes the legal, valid, and binding obligation of Purchaser, enforceable against it in accordance with its terms, subject to applicable laws relating to bankruptcy, insolvency, moratorium or other laws relating to creditors' rights generally and to general principles of equity.

3.3    No Conflict.

(a)    Neither the execution and delivery of this Agreement nor the consummation or performance of any of the transactions contemplated hereby will, directly or indirectly (with or without notice or lapse of time):

(i)    contravene, conflict with, or result in a violation of any provision of the Organizational Documents of Purchaser;

(ii)    contravene, conflict with, or result in a violation of, or give any Governmental Body or other Person the right to challenge any of the transactions contemplated hereby or to exercise any remedy or obtain any relief under, any Legal Requirement or any Order to which Purchaser is a party or subject; or

(iii)    contravene, conflict with, or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Contract to which Purchaser is a party.

3837337_6                                                    9

(b)    Purchaser is not required, and will not be required, to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the transactions contemplated hereby.

3.4    Litigation. There is no litigation or other proceeding by any Person, pending, or to the Knowledge of Purchaser threatened, against or affecting the transactions contemplated by this Agreement or Purchaser's ability to consummate such transactions.

3.5    Broker's or Finder's Fees. No agent, broker, investment banker, person, or firm acting on behalf of the Purchaser, or any person affiliated with it, or under its authority, is or will be entitled to a financial advisory fee, brokerage commission, finder's fee or other like payment in connection with the transactions contemplated hereby.

## ARTICLE IV  OTHER COVENANTS

4.1    Interim Operations of the Company. Except as expressly permitted by this Agreement and except as may be consented to in writing by Purchaser (which consent shall not be unreasonably withheld or delayed), from the date hereof to the Closing Date, Seller shall not:

(a)    conduct the Business other than in the same manner as heretofore conducted and only in the ordinary course;

(b)    outside the ordinary course of business, make any loan to, or enter into any non-arms' length transaction with, any stockholder, director or officer;

(c)    permit any insurance policies naming Seller as a beneficiary or a loss payable payee to lapse or expire, except to the extent such policies are replaced with equivalent policies, without diminution of or gaps in coverage and sufficient to insure the Assets or the Business to the same extent as currently insured;

(d)    change, in any material respect, any of the accounting methods used by it unless required by GAAP;

(e)    make any capital expenditures in an aggregate amount exceeding $10,000;

(f)    enter into any contract, agreement or understanding (written or otherwise) (i) the performance of which will extend over a period of more than six (6) months or (ii) which involves aggregate consideration payable by Seller in excess of $10,000 over the next twelve (12) months;

(g)    sell, transfer, encumber, lease, pledge, mortgage or otherwise dispose of all or any material portion of the Assets;

(h)    take any action that is reasonably likely to result in any of the conditions to the Closing set forth in this Agreement not being satisfied, or to impair the ability of Purchaser or Seller to consummate the Closing in accordance with the terms hereof or materially delay such consummation; or

(i)      enter into any agreement, contract, commitment or arrangement to do any of the foregoing.

4.2     Cooperation. Following the Closing, Seller and Purchaser shall provide each other and each other's employees, attorneys, accountants and other representatives, at all reasonable times (when reasonably necessary), with access to and copies of all books, papers and records pertaining to the Assets, the Excluded Assets, the Assumed Liabilities, the Retained Liabilities and the Business. The foregoing undertaking shall include, without limitation, Seller providing Purchaser with access to records pertaining to Seller's employees who are hired by Purchaser, to the extent permitted by law, and with access to the Excluded Assets to the extent required for Purchaser to comply with and/or complete the Assumed Contracts, or to effect a smooth transition in Purchaser's use of the Assets. No consideration will be paid for the foregoing unless the acts required are unrelated to a representation, warranty or covenant herein and are unreasonably burdensome to Seller or Purchaser, as the case may be, in which case reimbursement therefor will be made at a reasonable rate.

4.3     Employees.

(a)      Purchaser shall have the right, but not the obligation, to offer employment to and/or hire any of Seller's employees after the Closing Date. Seller shall be solely responsible for all benefits or damages accruing to Seller's employees by reason of their employment by, or termination from, Seller or by reason of the consummation of transactions described herein including, but not limited to, wages, payroll taxes, sick leave, vacation pay, severance pay, pension and retirement plans and medical or life insurance. The employees who accept Purchaser's offer of employment are referred to as "**Transferred Employees**." Purchaser shall not be responsible for Seller's employee benefit plans or for any obligations thereunder, which are among the Retained Liabilities.

(b)      Purchaser shall provide or cause to be provided to Transferred Employees initial compensation equal to the compensation provided to such Transferred Employees by Seller as of the date hereof.

(c)      After the Closing Date, Seller shall retain responsibility for providing health care continuation coverage in accordance with COBRA to all former employees (without regard to whether such employees become Transferred Employees) who are receiving (or become entitled to receive) continuation health coverage pursuant to an election made under COBRA relating to a qualifying event occurring prior to or on the Closing Date with respect to any Seller welfare plan subject to COBRA. Purchaser shall be responsible for providing health care continuation coverage in accordance with COBRA pursuant to a COBRA election made by a Transferred Employee or any individual who constitutes a qualified beneficiary under COBRA with respect to a Transferred Employee which relates to a qualifying event which occurs after the Closing Date.

(d)      Seller shall pay Transferred Employees for their accumulated but unused vacation days under Seller's applicable vacation policy for the year in which the Closing

Date occurs.  Transferred Employees shall participate in Purchaser's vacation policy on and after the Closing Date.

(e)    Purchaser shall assume responsibility and liability for Transferred Employees' workers' compensation claims relating to all injuries that are incurred subsequent to the Closing Date.  Seller shall remain responsible and liable for workers' compensation claims relating to injuries incurred on or prior to the Closing Date.

4.4    Confidentiality.  Before and after the Closing, Seller and Purchaser shall, and shall cause their representatives and Affiliates to, hold in strict confidence and not use or disclose to any other party without the prior written consent of the other party hereto, all confidential information obtained from the other party in connection with the transactions contemplated hereby and all information relating to the Assets and the Business; provided, however, that such information may be used or disclosed (i) when required by Legal Requirements, (ii) if it is publicly available other than as a result of a breach of this Agreement, or (iii) if it is otherwise expressly provided for herein.

4.5    Notice of Certain Events Regarding Liabilities.  Following the Closing, Purchaser and Seller shall each use its best efforts to notify the other, as promptly as practicable, of the receipt of any claims or occurrence of any other events relating to a Retained Liability, in the case of notices by Purchaser, or an Assumed Liability, in the case of notices by Seller, so that the relevant party may make a timely claim under any applicable insurance policy.

4.6    Inspections and Investigations.  Purchaser and its advisors shall be entitled to conduct, at Purchaser's expense, such inspections, investigations, studies and reviews as Purchaser shall desire to conduct with respect to or concerning the Assets, and the transactions contemplated by this Agreement, including, without limitation, such further environmental investigation and testing as Purchaser shall desire to conduct.  Seller agrees to give to Purchaser and its representatives such access to the Real Estate and the Business, and books and records of Seller concerning operations thereon, as Purchaser shall reasonably request in connection with its inspections and investigations and to allow Purchaser and its representatives to perform such assessing, testing, monitoring and investigation that Purchaser deems necessary in its sole discretion.  All such investigations of Purchaser shall be conducted in such manner as to not interfere unreasonably with the business and operations of Seller.  Purchaser shall have until the Closing Date to conduct such inspections, investigations, studies and reviews (the "**Feasibility Period**").  In the event that for any reason whatsoever Purchaser shall determine that (a) the Assets, or (b) any circumstances or facts relating thereto are unacceptable to Purchaser, Purchaser shall give written notice to Seller prior to 5:00 p.m. on the last day of the Feasibility Period, in which event this Agreement shall terminate and be of no further force and effect, and the parties shall be thereafter relieved of any obligations hereunder, except the Deposit shall be returned to the Purchaser and the obligations as set forth in Sections 4.4, 8.2 and 8.4 shall survive.

4.7    Covenant Not to Compete and Non-Solicitation.

(a)    Purchaser and Seller agree that the Purchase Price was fixed on the basis that the transfer of the Assets and Business to Purchaser would provide Purchaser with

the full benefit and goodwill of Seller as the Assets, the Business and the Assumed Contracts existed on the Closing Date. Seller acknowledges that it is proper for Purchaser to have assurance that the value of the Assets and Business will not be diminished by acts of Seller after the Closing Date. Therefore:

(i)    Seller covenants and agrees that, commencing on the Closing Date and ending on the tenth (10th) anniversary of the Closing Date (the "**Restricted Period**"), for any reason or no reason, it will not (A) directly or indirectly compete with, or own, manage, operate or control or participate in ownership, management, operation or control of, or provide consulting services or financial resources to, or act as guarantor for, any business, firm, corporation, partnership, person, proprietorship or other entity which is engaged in activities similar to the Business (the "**Restricted Business**") anywhere within a one hundred (100) mile radius of 318 North Elmer Avenue, Sayre, Pennsylvania;

(ii)    Will not, during the Restricted Period, directly or indirectly, entice away or attempt to entice away from employment or affiliation or hire or affiliate with any person who is an employee or independent contractor of the Purchaser or any of its affiliates or subsidiaries (collectively, the "**W&O Group**");

(iii)    Except on behalf of Purchaser, will not, during the Restricted Period, directly or indirectly, solicit or accept any business from any W&O Group customer related to any business conducted, directly or indirectly (including joint ventures and affiliations), by Purchaser or any parent, subsidiary or affiliate of Purchaser.

(b)    Remedies; Setoff.

(i)    The Seller acknowledges and agrees that in the event it breaches Section 4.7(a), the Purchaser will suffer immediate and irreparable harm and injury for which the Purchaser will have no adequate remedy at law. Accordingly, in the event Seller breaches Section 4.7(a), Purchaser shall be absolutely entitled to obtain equitable relief, including without limitation temporary restraining orders, preliminary injunctions, permanent injunctions, and specific performance.

(ii)    The foregoing remedies and relief shall be cumulative and in addition to any other remedies available to the Purchaser. In addition, the Purchaser may set off against payments due under the Notes if Seller is in violation of Section 4.7(a).

(c)    Tolling of Period. In the event the Seller commits a breach of a covenant set forth in subparagraph 4.7(a), the applicable time period that applies to such breached subparagraph shall be tolled during the period of such breach and shall be extended accordingly.

## ARTICLE V  ENVIRONMENTAL MATTERS

5.1    Allocation of Responsibility.

I f

(a)    ~~Unless~~ any of Seller's representations and warranties stated in Section 2.17 (Environmental Matters) or Section 2.18 (Underground Storage Tanks), or any representation or warranty given by Seller or James and Joseph Haggerty in the Real Estate Agreements are false or inaccurate, except for Environmental Conditions on the Real Estate, Seller shall retain all liability for, and shall be responsible for, Environmental Claims and/or Environmental Expenses arising from or relating to those Environmental Conditions which, without regard to the continuing nature of any release, arose or are attributable to the period prior to the Closing Date, regardless of whether the Environmental Condition had been discovered or manifested itself in any manner prior to the Closing Date and regardless of who caused such liability, who discovered such liability or when it was discovered (each, a "**Pre-Closing Environmental Condition**"). Seller shall also be responsible for remediation of any such Pre-Closing Environmental Conditions if remediation is required under any Environmental Law ("**Cleanup**"). "Cleanup", as used herein, shall also include monitoring and/or natural attenuation to the extent they are permitted by applicable laws, accepted by the applicable government agencies, and consistent with the requirements below.

(b)    Purchaser shall be responsible for those Environmental Conditions which arise or are attributable to the period subsequent to the Closing Date, regardless of who caused such liability or who discovered such liability (each, a "**Post-Closing Environmental Condition**").

(c)    With respect to an Environmental Condition discovered or identified after the Closing Date, Purchaser and Seller agree at the time of any such Environmental Claim or dispute to mutually engage an environmental technical consultant to investigate and identify, to the extent possible, the time period of origin of the underlying Environmental Condition. The costs of such consultant(s) shall initially be borne one-half by Seller and one-half by Purchaser, subject to later reallocation pursuant to the last sentence of this Section. If the investigation indicates that the Environmental Condition is a Pre-Closing Environmental Condition, Seller shall be solely responsible for such Environmental Condition and the Environmental Claims and/or Environmental Expenses arising therefrom. If the investigation indicates that the Environmental Condition is a Post-Closing Environmental Condition, Purchaser shall be solely responsible for such Environmental Condition and the Environmental Claims and/or Environmental Expenses arising therefrom. If the investigation indicates shared responsibility, then the parties shall share in the Environmental Claims and/or Environmental Expenses incurred as a result of the Environmental Condition to the extent and proportions indicated. If the investigation does not indicate which party is responsible, or cannot fairly apportion the responsibility, then the parties shall negotiate the matter. If the parties are unable to resolve the matter through negotiations, then Purchaser and Seller agree to promptly submit the matter to binding arbitration before the American Arbitration Association or another arbitration organization mutually acceptable to the parties. In any such arbitration, the burden of persuasion shall be on Seller for any Environmental Condition

3837337_6

14

discovered or identified on or before the fourth anniversary of the Closing Date and on Purchaser for any Environmental Condition discovered or identified more than four (4) years after the Closing Date. The arbitrator shall provide the parties with a written decision and shall allocate responsibility as required by this Section. The parties' costs of the arbitration and arbitrator, including legal and expert/consultant fees, shall be divided on a proportionate basis consistent with the allocation decision.

5.2    Cleanup for Pre-Closing Environmental Conditions.

(a)    If Cleanup is required under any applicable Environmental Law for any Pre-Closing Environmental Conditions, such Cleanup shall be paid for by Seller and shall be performed in accordance with the Pennsylvania Land Recycling and Environmental Remediation Standards Act, 35 P.S. §§ 6026.101-.909 ("**Act 2**"). In remediating any Pre-Closing Environmental Conditions, Seller shall secure written acknowledgement from the Pennsylvania Department of Environmental Protection that the remediation is in compliance with Act 2 standards. Seller's Cleanup for Pre-Closing Environmental Conditions shall be performed in accordance with Act 2 standards and guidelines. Seller may apply any of the remediation standards available under Act 2. Where Seller seeks to perform Cleanup under the site specific standard, Seller may apply the nonresidential standards and/or utilize any other legal or institutional controls allowed under Act 2 standards; provided that any deed notice, land use controls or institutional controls referencing such standards shall be reasonable under the circumstances, and (2) Seller obtains Purchaser's prior written consent to any deed notice, land use controls or institutional controls, such consent not to be unreasonably withheld.

(b)    Purchaser reserves the right to comment to Seller or any governmental entity regarding any submittal to any governmental entity and Seller shall, in good faith, provide that opportunity to Purchaser to comment on any reports or other materials to be submitted under Act 2 prior to any submittal and consider and act reasonably upon any comments made. Seller shall be deemed to have satisfied its obligation under this paragraph with respect to any materials if it fails to receive comments from Purchaser within ten (10) business days after providing such materials to Purchaser.

5.3    Environmental Reports. Seller has provided to Purchaser true and correct copies of all environmental studies, reports, assessments, tests, and related documents and records, which Seller or any of its agents or representatives possess, or to which they have access, which relate to or affect the Real Estate or any of the other Assets.

## ARTICLE VI  INDEMNIFICATION; REMEDIES

6.1    Survival. Except as otherwise expressly provided herein and subject to the time period limitations set forth in this Article, all representations, warranties, covenants and obligations in this Agreement and the Schedules attached hereto, and the certificates delivered pursuant to this Agreement, shall survive the Closing.

6.2    Definitions. For purposes of this Article:

"Losses" means all losses, damages, liabilities, payments and obligations, and all expenses related thereto, which in the case of any Assumed Liability or Retained Liability individually involve any amount, and which in any other instance individually involve at least One Thousand Dollars ($1,000). Losses shall include any reasonable legal fees and costs incurred by any of the Indemnified Persons subsequent to the Closing in defense of or in connection with any alleged or asserted liability, payment or obligation, whether or not any liability or payment, obligation or judgment is ultimately imposed against the Indemnified Persons and whether or not the Indemnified Persons are made or become parties to any such action.

"Indemnified Person" means any person entitled to be indemnified under this Article.

"Indemnifying Person" means any person obligated to indemnify another person under this Article.

"Purchaser's Indemnified Persons" means the Purchaser, its subsidiary corporations (or other entities), sister and other affiliated corporations (or other entities) and their respective directors, officers, employees, stockholders, members, managers and agents.

"Seller's Indemnified Persons" means the Seller, any parent corporation and any subsidiary, sister and other affiliated corporations, and their respective directors, officers, employees, stockholders and agents.

6.3    Indemnification by Seller . Subject to the limitations of Section 6.6, Seller shall indemnify, defend, and hold harmless Purchaser's Indemnified Persons from and against any and all Losses directly or indirectly incurred by any of them:

(a)    resulting from or arising out of any breach of any of the representations or warranties made by Seller in this Agreement or in any agreement, document or instrument executed and delivered pursuant hereto or in connection with the Closing;

(b)    resulting from or arising out of any breach of any covenant or agreement made by Seller in or pursuant to this Agreement (including, without limitation, Articles IV and V hereof) or in any agreement, document or instrument executed and delivered pursuant hereto or in connection with the Closing; or

(c)    in respect of the Retained Liabilities.

6.4    Indemnification by Purchaser. Subject to the limitations of Section 6.6, Purchaser shall indemnify, defend and hold harmless Seller's Indemnified Persons from and against any and all Losses directly or indirectly incurred by any of them:

(a)    resulting from or arising out of any breach of any of the representations or warranties made by Purchaser in this Agreement or in any agreement, document or instrument executed and delivered pursuant hereto or in connection with the Closing;

(b)    resulting from or arising out of any breach of any covenant or agreement made by Purchaser in or pursuant to this Agreement (including, without limitation, Articles IV and V hereof) or in any agreement, document or instrument executed and delivered pursuant hereto or in connection with the Closing; or

(c)    in respect of the Assumed Liabilities.

6.5    Miscellaneous. If any Loss is subject to indemnification under more than one provision hereof, the Indemnified Person shall be entitled to seek indemnification for such Loss until the expiration of the longest period of time within which to assert a claim for Loss under any of the provisions which are applicable.

6.6    Time Limitations. Seller shall have no liability with respect to any representation or warranty (other than those in Sections 2.1 and 2.13) unless, on or before the fourth anniversary of the Closing Date, Purchaser notifies Seller of a claim specifying the factual basis of that claim in reasonable detail to the extent then known by Purchaser; provided, however, a claim with respect to a representation or warranty in Sections 2.1 may be made by Purchaser at any time and a claim with respect to a representation or warranty in Section 2.13 may be made by Purchaser at any time prior to thirty (30) days following the expiration of the applicable statute of limitations, including any extension thereof. Purchaser shall have no liability with respect to any representation or warranty unless, on or before the fourth anniversary of the Closing Date, Seller notifies Purchaser of a claim specifying the factual basis of that claim in reasonable detail to the extent then known by Seller. There shall be no time limitation on the ability of an Indemnified Person to seek indemnification under Article V.

6.7    Procedure for Indemnification.

(a)    A claim for indemnification for any matter may be asserted by delivering, with reasonable promptness (but in any event within the time periods contemplated by Section 6.6, where applicable), written notice ("Claim Notice") to the Indemnifying Party from whom indemnification is sought. If, within sixty (60) days after delivery of the claim Notice, the Indemnifying Party does not dispute the claim in the Claim Notice, the Losses claimed in the Claim Notice shall be conclusively deemed a liability of the Indemnifying Party and such party shall pay the amount of the Losses to the Indemnified Party on demand.

(b)    If the Indemnifying Party disputes in whole or in part any claim and the amount in dispute is less than $100,000, the dispute shall be resolved by arbitration which shall be conducted by a single arbitrator under the Commercial Arbitration Rules of the American Arbitration Association. The law of Pennsylvania shall be applied by the arbitrator in consideration of the dispute. Unless otherwise agreed, the arbitration shall be conducted within the city of Lancaster, Pennsylvania. The arbitrator may award fees and costs in whole or in part to either party, but shall not be obligated to do so. Unless otherwise awarded by the arbitrator, each party shall bear its own counsel and expert witness costs, and the parties shall each pay one-half of the fees of the arbitrator. Any determination or award in arbitration shall be conclusive and binding upon the parties and may be entered as a final judgment in any court having jurisdiction.

3837337_6

17

## ARTICLE VII   CONDITIONS TO CLOSING

7.1   <u>Conditions to Each Party's Obligation to Effect the Closing</u>. The respective obligation of each party to effect the Closing shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions (any one or more of which may be waived):

(a)   <u>Legal Action</u>. On the Closing Date, there shall not be threatened or pending any Order by any Governmental Body or any other Person seeking to restrain or prohibit the consummation of the Transactions.

(b)   <u>Consents Obtained</u>. All material consents to the consummation of the Closing and the other Transactions listed on <u>Schedule 7.1(b)</u> shall have been obtained.

7.2   <u>Conditions to Obligations of Purchaser to Effect the Closing</u>. The obligations of Purchaser to consummate the Closing shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, the imposition of which is solely for the benefit of Purchaser and any one or more of which may waived by Purchaser:

(a)   <u>Representations and Warranties</u>. All of the representations and warranties of Seller set forth in this Agreement shall be true and complete in all material respects as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date (except to the extent that any such representation or warranty is made as of a specific date, in which case such representation or warranty shall be true and complete in all material respects as of such specified date).

(b)   <u>Performance by Seller</u>. Seller shall have performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed and complied with by it prior to or on the Closing Date.

(c)   <u>Certificate</u>. Purchaser shall have received a certificate, dated the Closing Date, signed by the President of Seller to the effect that (i) the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied and (ii) there has not been any material adverse change in the Assets or the Business since December 31, 2012.

(d)   <u>No Material Adverse Change</u>. Since December 31, 2012, there shall not have been any material adverse change in the assets, properties, business or financial condition of the Assets or the Business.

7.3   <u>Conditions to Obligations of Seller to Effect the Closing</u>. The obligations of Seller to consummate the Closing shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, the imposition of which is solely for the benefit of Seller and any one or more of which may be waived by Seller:

(a)   <u>Representations and Warranties</u>. All of the representations and warranties of Purchaser set forth in this Agreement shall be true and complete in all material respects as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date (except to the extent that any such representation or warranty is made

as of a specific date, in which case such representation or warranty shall be true and complete in all material respects as of such specified date).

## ARTICLE VIII  MISCELLANEOUS

8.1    Termination of Agreement.

This Agreement may be terminated:

(a)    by the mutual consent of Seller and Purchaser;

(b)    by Seller or Purchaser if the Closing has not taken place on or before March 4, 2013;

(c)    by Purchaser if any of the representations and warranties of Seller contained in Article II hereof were untrue, incorrect or incomplete in any material respect when made or at any time thereafter; and

(d)    by Seller if any of the representations and warranties of Purchaser contained in Article III hereof were untrue, incorrect or incomplete in any material respect when made or at any time thereafter.

8.2    Return of Documents. If this Agreement is terminated for any reason pursuant to Section 8.1, each party shall return to the other party all documents and copies thereof which shall have been furnished to it by such other party or, with the agreement of the other party, shall destroy all such documents and copies thereof and, upon request, certify in writing to the other party any such destruction.

8.3    Limitations on Remedies. If this Agreement is terminated by Seller or Purchaser as permitted under Section 8.1 and not as a result of a breach of a representation or warranty or the failure of any party to perform its obligations hereunder, such termination shall be without liability of any party. If a party terminates this Agreement as a result of a breach of a representation or warranty by the other party or the failure of the other party to perform its obligations hereunder, the nonbreaching party shall, in addition to other remedies provided by this Agreement, at law, or in equity, be entitled to reimbursement from the breaching party for all expenses incurred by the nonbreaching party in connection with this Agreement and the transactions contemplated hereby.

8.4    Expenses. The parties hereto shall pay all of their own expenses relating to this Agreement and transactions contemplated hereby, including, without limitation, the fees and expenses of its respective counsel and financial advisors.

8.5    Governing Law. THIS AGREEMENT, INCLUDING THE VALIDITY HEREOF AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE (WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PROVISIONS THEREOF). EACH OF THE PARTIES HERETO

3837337_6

AGREES THAT ANY ACTION OR PROCEEDING BROUGHT TO ENFORCE THE RIGHTS OR OBLIGATIONS OF ANY PARTY HERETO UNDER THIS AGREEMENT MAY BE COMMENCED AND MAINTAINED ONLY IN ANY COURT OF COMPETENT JURISDICTION LOCATED IN THE COMMONWEALTH OF PENNSYLVANIA. EACH OF THE PARTIES HERETO FURTHER AGREES THAT PROCESS MAY BE SERVED UPON IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED AS MORE GENERALLY PROVIDED IN SECTION 8.8 HEREOF, AND CONSENTS TO THE EXERCISE OF JURISDICTION OVER IT AND ITS PROPERTIES WITH RESPECT TO ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ENFORCEMENT OF ANY RIGHTS UNDER THIS AGREEMENT.

8.6    Captions: References. The Article and Section captions used herein are for reference purposes only, and shall not in any way affect the meaning or interpretation of this Agreement.

8.7    Variation in Pronouns. Etc. All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the identity of the Person or Persons may require.

8.8    Notices. Any notice or other communications required or permitted hereunder shall be in writing and, unless otherwise provided herein, shall be deemed to have been duly given upon delivery in person, by facsimile, by overnight courier or by certified or registered mail, return receipt requested, as follows:

| | |
|---|---|
| If to Seller: | J. W. Bishop Company, Incorporated |
| | 377 Pennsylvania Avenue |
| | Towanda, PA 18848 |
| | Attn: James M. Haggerty |
| | Facsimile:_____ |
| | |
| If to Purchaser: | Worley & Obetz, Inc. |
| | 85 White Oak Road |
| | Manheim, PA 17545 |
| | Attn: Jeff Lyons, President |
| | Facsimile: (717) 664-6891 |
| | |
| With a copy to: | Barley Snyder LLP |
| | 126 East King Street |
| | Lancaster, PA 17602 |
| | Attention: John T. Reed, Esquire |
| | Facsimile: (717) 291-4660 |

or at such other address or telecopy number as shall have been furnished in writing by any such party in the manner set forth herein. Each such notice or other communication shall be effective (i) when received, if hand delivered, (ii) upon confirmation of receipt, if by facsimile, (iii) one

3837337_6

day following deposit, if sent by overnight courier, or (iv) on the third business day following the date on which such communication is posted, if sent by certified or registered mail.

8.9   Parties in Interest.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Agreement may not be transferred, assigned, pledged or hypothecated by any party hereto without the prior consent of the other parties hereto; provided that (a) Purchaser may assign its rights hereunder to a lender in connection with its financing activities, and (b) Purchaser may assign its rights hereunder to an entity controlled by the current shareholders of Purchaser.

8.10   Counterparts.  This Agreement may be executed in two or more counterparts, all of which taken together shall constitute one instrument.

8.11   Entire Agreement.  This Agreement, including the other documents referred to herein which form a part hereof or any other written agreements that the parties enter into pursuant to or relating to the transactions contemplated by this Agreement, contains the entire understanding of the parties hereto with respect to the subject matter contained herein and therein. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter. All exhibits and schedules referred to herein and attached hereto are incorporated herein by reference.

8.12   Amendments.  This Agreement may not be changed or modified orally, but only by an agreement in writing signed by Seller and Purchaser.

8.13   Severability.  Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

8.14   Third Party Beneficiaries.  Each party hereto intends that this Agreement shall not benefit or create any right or cause of action in or on behalf of any Person other than the parties hereto.

8.15   Publicity and Disclosures.  Neither party will issue a news release, public announcement, notice to customers or any other announcement concerning this Agreement or the transactions provided for herein without the prior written consent of the other (such consent not to be unreasonably withheld).

8.16   Waiver.  Except to the extent that a party may have otherwise agreed in writing, no waiver (including proceeding to the Closing) by such party of any breach by any other party of any such other party's representations, warranties, obligations, agreements or covenants hereunder will be deemed to be a waiver of any subsequent breach of the same or any other representations, warranties, obligations, agreements or covenants.  No forbearance by a party to seek a remedy for any breach by any other party will be deemed a waiver of its rights or remedies with respect to such breach, except to the extent that such party otherwise agrees in

writing. The consummation of the transactions described herein by any party shall not constitute a waiver of any known breaches of any other party's representations, warranties, obligations, agreements or covenants unless the same are expressly waived in writing.

8.17    Bulk Sales Law. Purchaser and Seller acknowledge that the bulk sales laws apply to the transactions contemplated herein. Purchaser and Seller waive compliance with the provisions of any applicable bulk sales, fraudulent conveyance or other law for the protection of creditors, and Seller shall indemnify, defend and hold the Purchaser harmless from, and reimburse the Purchaser for any Loss which the Purchaser suffers or incurs by virtue of noncompliance with, such laws.

## ARTICLE IX  DEFINITIONS

"Affiliate" is used in this Agreement to indicate a relationship with one or more Persons, and when used, means any Person that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, the Person specified.

"Agreement" means this Asset Purchase Agreement.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"Contract" means any bid, agreement, contract, instrument, obligation, promise, commitment or undertaking (whether written or oral and whether express or implied) that is legally binding.

"DEP" shall mean the Pennsylvania Department of Environmental Protection.

"Encumbrance" means any charge, claim, community property interest, condition, covenant, equitable interest including any equitable servitude, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Environmental Claim" means any Third Party Action, including without limitation those asserted by any Governmental Body, arising out of or relating to any Environmental Condition or any Environmental Noncompliance.

"Environmental Conditions" means conditions of the environment, including the ocean, natural resources (including flora and fauna), soil, surface water, ground water, any present or potential drinking water supply, subsurface strata or the ambient air, relating to or arising out of the use, handling, storage, treatment, recycling, generation, manufacture, formulation, migration, transportation, release, emission, spilling, leaking, pumping, pouring, emptying, discharging, injecting, escaping, leaching, disposal, dumping or threatened release of Regulated Substances.

"Environmental Expenses" means any liability, loss, cost or expense arising out of Environmental Noncompliance including, without limitation, costs of investigation, characterization, cleanup, remedial or response action, site control, fines, civil penalties, the costs associated with posting financial assurances for the completion of response, remedial or corrective actions, obtaining permits, the preparation of any closure or other necessary or

required plans or analyses, or other reports or analyses submitted to or prepared by regulating agencies, including the cost of health assessments, epidemiological studies and the like, retention of engineers and other expert consultants, legal counsel, capital improvements, operation and maintenance testing and monitoring costs, power and utility costs and pumping taxes or fees, and administrative costs incurred by governmental agencies.

"**Environmental Law**" means any federal (including but not limited to the Clean Water Act, 33 U.S.C. Sections 1251 et seq., the Toxic Substances Control Act, 15 U.S.C. Sections 2601 et seq., the Clean Air Act, 42 U.S.C. Sections 7401 et seq., the Safe Drinking Water Act, 42 U.S.C. Sections 300f et seq., the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Sections 9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq., and the River and Harbor Act, 33 U.S.C. Section 407, the Hazardous Material Transportation Act, 49 U.S.C. 1801 et seq., the Federal Insecticide, Fungicide and Rodenticide Act, 7. U.S.C. Sections 136 et seq., the Toxic Substances Control Act, 15 U.S.C. Sections 2601 et seq., and the Oil Pollution Act of 1992, 33 U.S.C. Sections 2701 et seq.), state or local statute, ordinance or promulgated rule or regulation, any judicial or administrative order or judgment (whether or not by consent), any duties imposed by common law and any provision or condition of any permit, license or other operating authorization relating to (i) the protection of the environment or the public welfare from actual or potential exposure (or the effects of exposure) to any actual or potential release, discharge, disposal or emission (whether past or present) of any Regulated Substance or (ii) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of any Regulated Substance.

"**Environmental Noncompliance**" means (1) the release of any Regulated Substances into the environment, any storm drain, sewer, septic system or publicly owned treatment works, in violation of any Environmental Law, (2) any failure of any physical structure, equipment, fixture, process or facility to comply with any Environmental Law; and (3) the operation of any facility or equipment in violation of any Environmental Law.

"**GAAP**" means generally accepted United States accounting principles, applied on a basis consistent with past practices.

"**Governmental Authorization**" means any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

"**Governmental Body**" means any federal, state, local, municipal, foreign, or other governmental or jurisdictional body (including any governmental agency, branch, department, official, or entity and any court or other tribunal).

"**IRS**" means the Internal Revenue Service.

"**Knowledge**" means (i) with respect to an individual, such individual has actual personal knowledge of the matter of fact in question, or (ii) with respect to the Seller or Purchaser, a member of senior management has actual personal knowledge of such matter or fact.

3837337_6                              23

"**Legal Requirement**" means any federal, state, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty.

"**Order**" means any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body or by any arbitrator.

"**Organizational Documents**" means (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) the certificate of organization of a limited liability company and (c) any charter or similar document adopted or filed in connection with the creation, formation, or organization of any other Person; in each case together with all amendments thereto.

"**Person**" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

"**Prepaid Expenses**" means any prepaid Governmental Authorizations, or other prepaid items pertaining to the Business (but excluding any income taxes, insurance premiums or real estate taxes) which under GAAP are reflected as assets on a balance sheet of Seller on the Closing Date and the benefits of which are transferable to Purchaser and useable by it following the Closing.

"**Real Estate**" means the property and improvements upon which the Business has historically operated which include: (i) 318 N. Elmer Avenue, Sayre, PA; (ii) that certain lot on North Lehigh Avenue, Sayre, PA; (iii) 417 North Lehigh Avenue, Sayre, PA; and (iv) the property described in a deed dated March 28, 1963 recorded in the Bradford County Recorder of Deeds Office at Book 563, Page 487.

"**Real Estate Agreements**" means those certain Real Estate Purchase Agreements between J. W. Bishop Properties, LLC "Buyer" and J. W. Bishop Company, Inc. and Buyer and James Haggerty and Joseph Haggerty, for the Real Estate.

"**Regulated Substances**" means any solid or hazardous waste, hazardous materials, hazardous substances, toxic substances or other substance which is listed, regulated or designated as toxic or hazardous or words of similar meaning and regulatory effect under any Environmental Laws, including without limitation petroleum and petroleum-derived products.

"**Schedule**" means any schedule delivered by Seller or Purchaser pursuant to, and referred to in, this Agreement.

"**Tax**" means any federal, state, local or foreign tax including, without limitation, any tax on or relating to gross income, net income, franchise, gross receipts, royalty, capital gains, value added, sales, property, ad valorem, transfer, license, use, profits, windfall profits, environmental, withholding on amounts paid to or by Seller, payroll, employment, excise, severance, stamp, occupation, premium, gift, or estate, levy, assessment, tariff, duty, deficiency, or other fee, and any related charge or amount (including any fine, penalty, interest, or addition to tax), imposed, assessed, or collected by or under the authority of any Governmental Body or payable pursuant

to any tax-sharing agreement or any other Contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, deficiency, or fee.

"**Tax Return**" means any return (including any information return), declaration report, statement, schedule, notice, form, claim for refund, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Legal Requirement relating to any Tax.

"**Trade Payables**" means the accounts payable of Seller arising from the conduct of the Business in the normal course.

"**Transactions**" means all the transactions provided for or contemplated by this Agreement.

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement to be effective as of the day and year first above written.

WORLEY & OBETZ, INC.
("Purchaser")

By: _____
Jeffrey B. Lyons, President

J. W. BISHOP COMPANY, INCORPORATED

By: _____
Name: _____
Title: _____

The undersigned, being all of the Shareholders of Seller, jointly and severally (together with the Seller), intending to be legally bound, have entered into this Agreement for the sole purposes of evidencing and confirming their agreement to be bound by the terms and conditions of Section 2 (Representations and Warranties of Seller), Section 4.7 (Covenant Not to Compete and Non-Solicitation), Article V (Environmental Matters) and Article VIII (Miscellaneous) of this Agreement.

_____    _____
Witness                                                      James M. Haggerty

_____    _____
Witness                                                      Joseph Haggerty

3837337_6                                        25

## TABLE OF DEFINED TERMS

| TERM | SECTION |
|---|---|
| Act 2 | Section 5.2(a) |
| Affiliate | Article IX |
| Agreement | Article IX |
| Assets | Section 1.1 |
| Assumed Contracts | Section 1.1(g) |
| Business | Background |
| Claim Notice | Section 6.7(a) |
| Cleanup | Section 5.1(a) |
| Closing | Section 1.9 |
| Closing Date | Section 1.9 |
| COBRA | Article IX |
| Contract | Article IX |
| Customer List | Section 2.6 |
| DEP | Article IX |
| Deposit | Section 1.3 |
| Effective Date | Opening Paragraph |
| Encumbrance | Article IX |
| Environmental Claim | Article IX |
| Environmental Conditions | Article IX |
| Environmental Expenses | Article IX |
| Environmental Law | Article IX |
| Environmental Non-Compliance | Article IX |
| Equipment | Section 1.1(a) |
| ERISA | Section 2.15(a) |
| Escrow Agent | Section 1.3 |
| Feasibility Period | Section 4.6 |
| Financial Statements | Section 2.8 |
| GAAP | Article IX |
| Governmental Authorization | Article IX |
| Governmental Body | Article IX |
| Indemnified Person | Section 6.2 |
| Insurance Policies | Section 2.14 |
| Intellectual Property | Section 1.1(d) |
| IRS | Article IX |
| Jim | Opening Paragraph |
| Joe | Opening Paragraph |
| Knowledge | Article IX |
| Legal Requirement | Article IX |
| Liquid Inventory | Section 1.1(f) |
| Liquid Inventory Purchase Price | Section 1.4(a) |
| Losses | Section 6.2 |

3837337_6

| | |
|---|---|
| Note | Section 1.5(b) |
| Operating Supplies | Section 1.1(b) |
| Order | Article IX |
| Organizational Documents | Article IX |
| Parts Inventory | Section 1.1(e) |
| Parts Inventory Purchase Price | Section 1.4(b) |
| Person | Article IX |
| Plans | Section 2.15(a) |
| Post-Closing Environmental Condition | Section 5.1(b) |
| Pre-Closing Environmental Condition | Section 5.1(a) |
| Prepaid Expenses | Article IX |
| Pre-Payment Amount | Section 1.7(a)(i) |
| Purchase Price | Section 1.4 |
| Purchaser | Opening Paragraph |
| Purchaser's Indemnified Persons | Section 6.2 |
| Real Estate | Article IX |
| Regulated Substances | Article IX |
| Restricted Business | Section 4.7(a)(i) |
| Restricted Period | Section 4.7(a)(i) |
| Retained Liabilities | Section 1.7(b) |
| Schedule | Article IX |
| Seller | Opening Paragraph |
| Seller's Indemnified Persons | Section 6.2 |
| | |
| Tax | Article IX |
| Tax Return | Article IX |
| Trade Payables | Article IX |
| Transaction | Article IX |
| Transferred Employees | Section 4.3 |
| Vehicles | Section 1.1(c) |
| W&O Group | Section 4.7(a)(ii) |

3837337_6

## LIST OF EXHIBITS AND SCHEDULES

**Exhibit A - Promissory Notes**

**Schedules:**

| | |
|---|---|
| Equipment | Schedule 1.1(a) |
| Vehicles | Schedule 1.1(c) |
| Intellectual Property | Schedule 1.1(d) |
| Assumed Contracts | Schedule 1.1(g) |
| Allocation of Purchase Price | Schedule 1.6 |
| Sales Volume | Schedule 2.5 |
| Customer List | Schedule 2.6 |
| Contracts | Schedule 2.10 |
| Litigation | Schedule 2.12 |
| Insurance Policies | Schedule 2.14 |
| Employee Benefit Plans | Schedule 2.15 |
| Consents | Schedule 7.1(b) |

3837337_6

## SCHEDULES TO ASSET PURCHASE AGREEMENT
## BETWEEN
## WORLEY & OBETZ, INC.
## AND
## J. W. BISHOP, INCORPORATED T/D/B/A BISHOP FUELS

| | |
|---|---|
| Equipment | Schedule 1.1(a) |
| Vehicles | Schedule 1.1(c) |
| Intellectual Property | Schedule 1.1(d) |
| Assumed Contracts | Schedule 1.1(g) |
| Allocation of Purchase Price | Schedule 1.6 |
| Sales Volume | Schedule 2.5 |
| Customer List | Schedule 2.6 |
| Contracts | Schedule 2.10 |
| Litigation | Schedule 2.12 |
| Insurance Policies | Schedule 2.14 |
| Employee Benefit Plans | Schedule 2.15 |
| Consents | Schedule 7.1(b) |

3843369

Schedule 1.1(a) - Equipment

Please see attached "Office List", and "Shop and Yard List".

4-30-12

## Office List

**Basement:**

$3,200 - Telephone system, Samsung Office Serv 7100 w/APC backup (2009)

$2,000 - Water treatment system

   200 - Fire Extinguishers

   400 - Washer/dryer (Maytag)

   480 - File cabinets - 4 drawers (8)

   100 - (2) Dehumidifiers

**1st Floor:**

   120 - Adding machine (3)

   150 - Fire extinguishers (2)

   100 - Ticket desk

   150 - Post office pigeon hole and chair

   150 - Dispatch desk and chair and credenza

    50 - Dispatch counter and 2 chairs and (5) - 2 drawer cabinets

   150 - SVC Mgr. Desk, credenza, chairs (3)

   250 - Safe

   150 - Insulated file - 2 drawer

    75 - Paper shredder, Fellowes PS80C -2

   150 - (2) Map hangers

   800 - Customer Counter Desk - oak

   800 - Oak file

   500 - Oak Desk

    25 - Chair

   150 - Customer entrance furniture/displays

   150 - (3) Display wall boards (glass)

   150 - Window A/C units (2)

   300 - Water cooler, Halsey-Taylor - Water heater/cooler oasis

   300 - Copier, Cannon PC 941

**2nd Floor:**

   900 - (12) Office desks

   300 - (1) fire proof credenza large

   400 - (16) office chairs

   525 - (7) Credenzas

    25 - (1) Electric typewriter

   100 - (4) 2 drawer file cabinets

   400 - (2) 4 drawer fireproof file cabinets

600 - (6) Printer Okidata
100 - (1) Laser Printer
3,500 - File Server and 3 workstations (2010)
225 - (3) Printer stands - 2 tier
225 - (1) Laptop Toshiba Windows XP
100 - Fax HP 1040
200 - (6) APC Battery Backup
160 - (4) Adding machines
25 - Portable radio/tape/cd
25 - Pedestal fan
25 - White board 4'x12'
200 - Desk equipment - staplers, tape dispensers, etc.
500 - Office Equipment inventory, paper, tickets, forms
250 - Scanner Epson Gt 1500
800 - Copier Cannon 2200
25 - Microwave oven, Kenmore
200 - Refrigerator/freezer, Kenmore
150 - Window A/C units (2)
200 - Fire extinguishers

## 3rd Floor:

200 - 4 Drawer fireproof file cabinet
40 - (2) 2 drawer files
900 - (3) Office desk
600 - (3) Credenza
300 - Conference table
75 - (3) desk chair
290 - (29) chair
150 - VCR/Screen/stand video library (training)
60 - (3) Ficus tree
100 - Fire extinguisher
150 - Window A/C unit (2)

---

$23,775 - Total

## Shop and Yard List as of 4/26/12

$ 2,559 - #115 Tank/pump/meter
    300 - Cart pumps (3)
    500 - Fork truck
    950 - Welder Mig 1 PH, L-Tec 225
  1200 - Welder Tig 1 PH, Lincoln I Dealarc 300/300 Tig
  1500 - Welder Tig 3 PH, P55 3500/wu10 kemppl
  2200 - Air compressor 15 HP 3 phase Quincy
    150 - Parts washer
    250 - Metal brake
    200- Metal shear
    350 - Hyd. Press
    250 - Welding bench
14,500 - 4 Post lift Sefac 1 200M65BL 16,000x4 post w/ adapters ($26,000 new)
  3,500 - Waste oil furnace/tanks
    600 - Transmission Jack
  2,500 - Wheel Jack/Dolly Sefac
  4,500 - Pipe threader, 2 machines - 1 tripod, various dies and handles
    150 - Salamander heater
    150 - Kero heaters (2)
    250 - Pressure washer, Coleman gas
    350 - Pressure washer, Honda gas
    200 - Water heater
    100 - Refrigerator
    500 - A/C recovery cart, tanks
    100 - Chop saw
    200 - Drill press
  1,500 - Hand tools, air hose, cords
    300 - Jack stands
    600 - Jacks
    500 - (6) Fire extinguishers
  2,250 - (15) Advertising signs
  5,000 - (2) Site trucks w/electric diesel pumps
12,000 - (3) 1995 WIA Volvo Tractor
  1,500 - Weigh Scale 25,000 lb. w/digital
  2,000 - (2) Storage truck bodies
    200 - Grease gun, air
    200 - Heavy oil cart/pump

```
   250 - Pedestal grinder
    50 - Small grinder
   400 - Torch set/cart
   250 - Toolbox  rolling - 10 drawer
 2,500 - HVAC tools
   500 - (2) 300 g. tank w/pump
 1,500 - (1) 1,000 DBL wall tank w/pump
15,000 - (5) 4,000 g. vertical tank
 6,000 - (4) 3" roper pumps w/3 phase motors (portable)
```

**$90,509 - Total**

Schedule 1.1(c) - Vehicles

Please see attached Fleet Vehicle Listing.

Fixed Assets

"FLTLICVIN"                MSWORD8        1/17/2013              FLEET VEHICLE LISTING

| LICENSE PLATE NUMBER | DATE PURCHASED | FLEET VEHIC # | MODEL YEAR | DESCRIPTION | SERIAL # | LINE # |
|---|---|---|---|---|---|---|
| XM87749 | 2/94 | 2 | 73 | FRUEHAUF OIL TRLR | UNP442908 | 1 |
| XL08390 | 5/95 | 4 | 68 | FRUEHAUF OIL TRLR | UNJ312301 | 2 |
| XM95691 | 5/97 | 29 | 76 | FRUEHAUF ASPH TRLR | UNS507820 | 3 |
| XL08389 | 4/97 | 30 | 80 | FRUEHAUF GAS TRLR | UNT007703 | 4 |
| XR27391 | 8/97 | 37 | 70 | MCCOY TAYLOR AS/TRL | W2302 | 5 |
| XBL6183 | 4/98 | 40 | 77 | CUSTOM ASPH TRLR | S320377 | 6 |
| AE79206 | 4/00 | 60 | 92 | WTGMC OIL TRK | 4V1VDBDE9NN648198 | 7 |
| AE79207 | 4/00 | 61 | 92 | WTGMC OIL TRK | 4V1VDBME9NN648055 | 8 |
| AE79201 | 4/00 | 62 | 95 | VLVO OIL TRK | 4V1VDBPE5SN705035 | 9 |
| AE79202 | 4/00 | 63 | 95 | VLVO OIL TRK | 4V1VDBPE3SN705034 | 10 |
| AE79200 | 5/02 | 68 | 96 | VLVO OIL TRK | 4V4JDBGF1TR839058 | 11 |
| AE79205 | 5/02 | 69 | 96 | VLVO OIL TRK | 4V4JDBGF4TR839071 | 12 |
| XBL6184 | 5/02 | 71 | 97 | POLAR GAS TRAILER | 1PMA24321V5001229 | 13 |
| XR09914 | 5/04 | 77 | 94 | FRUEHAUF ASPH  TRLR | 4J8T04429RT018807 | 14 |
| YCP3842 | 11/04 | 115 | 90 | DODGE PICKUP | 1B7KM2688LS711430 | 15 |
| XBM7759 | 2/05 | 79 | 76 | TRAILMOBILE OIL TRLR | N41289 | 16 |
| XBM7838 | 2/05 | 80 | 81 | FRUEHAUF OIL TRLR | 1H4T04124BK011109 | 17 |
| XBG7559 | 2/05 | 82 | 88 | FRUEHAUF GAS TRLR | 1H4T04321JL010505 | 18 |
| XBG7558 | 2/05 | 81 | 89 | ETNYRE ASPH TRLR | 1E9T43207KE007193 | 19 |
| XBM5813 | 3/05 | 83 | 90 | ETNYRE ASPH TRLR | 1E9T43306LE007251 | 20 |
| AF25398 | 6/05 | 84 | 95 | FREIGHTLINER OIL TRK | 1FV6HFBA8SL648719 | 21 |
| AF27816 | 6/05 | 85 | 98 | VOLVO TRACTOR | 4VG7DARJ3WN755084 | 22 |
| AE79198 | 6/05 | 86 | 99 | VOLVO TRACTOR | 4VG7DARJXXN786608 | 23 |
| AF29537 | 10/05 | 87 | 00 | VOLVO TRACTOR | 4V4ND2RH2YN241933 | 24 |
| AE79199 | 10/05 | 88 | 00 | VOLVO TRACTOR | 4V4ND2RH8YN241936 | 25 |
| AE79197 | 12/05 | 89 | 00 | VOLVO TRACTOR | 4V4ND2RH4YN796107 | 26 |
| AF13498 | 12/05 | 90 | 00 | VOLVO TRACTOR | 4V4ND2RH0YN796105 | 27 |
| AF13500 | 12/05 | 91 | 00 | VOLVO TRACTOR | 4V4ND2RH2YN796106 | 28 |
| AE79194 | 02/06 | 92 | 00 | VOLVO TRACTOR | 4V4ND2RH3YN796101 | 29 |
| AF13499 | 02/06 | 93 | 99 | VOLVO TRACTOR | 4VG7DARH6XN778423 | 30 |
| AE79195 | 02/06 | 94 | 00 | VOLVO TRACTOR | 4V4ND2RH1YN796100 | 31 |
| XCG1219 | 10/05 | 95 | 77 | FRUEHAUF ASPH TRLR | UNX557901 | 32 |
| XCG1218 | 04/06 | 98 | 99 | TRAILMASTER ASP TRLR | 190LA4536X3H13598 | 33 |
| XCH6605 | 10/05 | 99 | 77 | ETNYRE ASPH TRLR | K2545K9123 | 34 |
| XCG6753 | 01/06 | 150 | 66 | FRUEHAUF OIL  TRLR | UNG248401 | 35 |
| XCH6606 | 11/06 | 151 | 95 | ETNYRE ASPH TRLR | 1E9T43201SE007190 | 36 |
| XDD3315 | 04/07 | 159 | 89 | ETNYRE ASPH TRLR | 1E9T43307KE007015 | 37 |
| XDM6835 | 06/07 | 160 | 77 | ETNYRE ASPH TRLR | K2546K9124 | 38 |
| GZW8726 | 3/08 | 118 | 96 | TOYOTA 4-RUNNER | JT3HN87R4T0022079 | 39 |
| DFH9831 | 4/08 | 119 | 96 | TOYOTA 4 RUNNER | JT3HN87R8T0027236 | 40 |
| XBL6182 | 4/08 | 161 | 77 | ETNYRE ASPH TRL | K2544K9122 | 41 |
| XM78146 | 08/08 | 163 | 90 | BOBKO DUMP TRLR | 1B9A24028LA128063 | 42 |
| XFW0863 | 05/10 | 164 | 73 | CITY FLATBED | AF503303 | 43 |
| XFZ6364 | 07/10 | 165 | 63 | FRUEHAUF DUMP TRLR | FWD692205 | 44 |
| XGH7334 | 08/10 | 166 | 77 | FRUEHAUF DUMP TRLR | FWY866101 | 45 |
| YZE7054 | 10/10 | 122 | 01 | TOYOTA TUNDRA | 5TBBT48111S166751 | 46 |
| XFN8660 | 12/10 | 168 | 80 | FRUEHAUF FLATBED | FWT067601 | 47 |
| XFN8661 | 12/10 | 169 | 79 | 79 DORSEY FLATBED | HW13929 | 48 |
| HBL2071 | 01/11 | 123 | 04 | FORD F-350 | 1FTSW31P44ED55802 | 49 |
| XBG6442 | 03/11 | 124 | 87 | TRAILKING UTIL. TRLR | 1TKCO2421HMO38953 | 50 |
| XCJ5449 | 03/06 | 152 | 90 | HOMEBUILT TRLR(3,000LB) | MYA418471 | 51 |
| GYN7732 | 03/12 | 125 | 99 | TOYOTA 4 RUNNER | JT3HN87R6X9029276 | 52 |
|  |  | 162 | 98 | VOLVO TRACTOR | 4VG7DARJ6WN753846 | 53 |

Schedule 1.1(d) - Intellectual Property

Trade names:  Bishop Fuel Company, AAmerican Discount Fuel Company , American Ultra Pure Company or American Fleet Service Company

Website: http://bishopfuel.com/

Schedule 1.1(g) - Assumed Contracts

Seller will assume the contracts on Schedule 2.10 but for those marked with an "*".

3843369

Schedule 1.6 - Allocation of Purchase Price

| | |
|---|---|
| Vehicles | $705,000 |
| Shop Equipment | $102,284 |
| Tank Farm | $205,000 |
| Goodwill | $809,716 |
| | $1,822,000.00 |

3843369

Schedule 2.5 - Sales Volume

Attached hereto as Schedule 2.5 is a true and correct listing of sales volume, month-to-month for calendar years 2009, 2010 and 2011 for No. 2 fuel oil.

J.W. Bishop Co., Inc.

#2 Fuel Oil Gallons Sold

|           | 2009      | 2010      | 2011      |
|-----------|-----------|-----------|-----------|
| January   | 217610.5  | 143267.3  | 159739.2  |
| February  | 151220.1  | 135745.1  | 116043.8  |
| March     | 126342.3  | 89970.1   | 98343.4   |
| April     | 64919.0   | 42321.7   | 51645.2   |
| May       | 24726.7   | 24015.4   | 20948.0   |
| June      | 11683.0   | 9477.7    | 4676.5    |
| July      | 10099.4   | 14183.6   | 9097.2    |
| August    | 13730.9   | 11929.0   | 12175.6   |
| September | 39094.7   | 38651.5   | 37191.3   |
| October   | 75040.5   | 57397.1   | 38821.4   |
| November  | 70309.5   | 86624.4   | 66534.7   |
| December  | 146247.7  | 147709.5  | 82956.7   |
| TOTAL     | 951024.3  | 801292.4  | 698173.0  |

Schedule 2.6 - Customer List

A true and correct copy of the customer list of Seller has been provided to Purchaser.

## Schedule 2.10 - Material Contracts

Lease dated August 15, 2012 between J.W. Bishop Company and Waverly Trade Center, LLC
(trailer parking)

Schedule 2.12 - Litigation

None

3843369

Schedule 2.14 - Property and Casualty Insurance

Please see attached Declarations Sheet from Nationwide Agribusiness

3843369

**Nationwide®**
**Agribusiness**
*On Your Side℠*

JTURKING  / 06/28/12

## COMMERCIAL LIABILITY UMBRELLA
## DECLARATIONS

[ ] New    [X] Renewal    [ ] Endorsement - Effective: 06/30/2012 | 12:01a.m. Standard Time, at your location as stated herein.

Issued By: FARMLAND MUTUAL INSURANCE CO

Replaces any previous declaration bearing the same number for this policy period.

**Named Insured and Mailing Address**

J W BISHOP CO INC
318 N ELMER AVE
SAYRE PA 18840

Policy Number:  CU 122902B
Client Number:  0000122902

**Producer  90175**

DONNER-FARBER & ASSOCIATES
PO BOX 7
BERLIN PA 15530

· Phone Number:    814-267-4654

**Policy Period: From** 06/30/12    **To** 06/30/13
12:01 A.M. Standard Time at your mailing address.

**Form of Business:** CORPORATION
**Description of Business:** REFINED FUEL DISTRIBUTOR

In return for the payment of the premium, and subject to all the terms of this policy,    we agree to provide **you** with the insurance as stated in this policy.

## LIMITS OF INSURANCE

| | |
|---|---|
| $        1,000,000 | **Each Occurrence Limit** |
| $        1,000,000 | **Personal and Advertising Injury Limit** |
| $        1,000,000 | **Aggregate Limit** |
| $ | **Surcharges, Taxes, Etc.** |

**SELF-INSURED RETENTION:**    $0

**PREMIUM:** $     4,040.00    [X] Flat Charge  [ ] Adjustable (See Premium Schedule)

In the event of cancellation by you, we shall receive and retain not less than $    250 as the Minimum Premium.

**CCU 51 00 07 05**

Page 1 of 2

Policy  CU 122902B

### SCHEDULE OF UNDERLYING INSURANCE

| Company, Policy Number, Policy Period | Coverage Type | Minimum Applicable Limits |
|---|---|---|
| FARMLAND MUTUAL INSURANCE COMPANY<br>CPP 122902B<br>06/30/12 TO 06/30/13 | COMMERCIAL GENERAL LIABILITY | $2,000,000 GENERAL   AGGREGATE<br>$2,000,000 PRODUCTS/COMPLETED<br>OPERATIONS AGGREGATE<br>$1,000,000 EACH OCCURRENCE<br>$1,000,000 PERSONAL AND<br>ADVERTISING INJURY LIMIT |
| | EMPLOYEE BENEFITS LIABILITY | $1,000,000 EMPLOYEE   BENEFITS<br>LIABILITY EACH EMPLOYEE<br>$1,000,000 EMPLOYEE BENEFITS<br>LIABILITY POLICY LIMIT |
| | AUTO LIABILITY | $1,000,000 COMBINED SINGLE   LIMIT |
| FARMLAND MUTUAL INSURANCE COMPANY<br>WCC 122902B<br>06/30/12 TO 06/30/13 | EMPLOYERS LIABILITY | $500,000 BODILY INJURY<br>EACH ACCIDENT<br>$500,000 BODILY INJURY<br>EACH EMPLOYEE<br>$500,000 BODILY INJURY<br>POLICY LIMIT |

ENDORSEMENT ATTACHED TO THIS POLICY:  See SCHEDULE OF POLICY FORMS AND ENDORSEMENTS.

_____
AUTHORIZED SIGNATURE

CCU 51 00 07 05

Page 2 of 2

Schedule 2.15 - Employee Benefit Plans

J. W. Bishop Co. Savings Incentive Match Plan

Aetna Healthcare and Prescription benefit policy

Aflac policy

Schedule 7.1(b) - Consents

Consent regarding Lease dated August 15, 2012 between J.W. Bishop Company and Waverly
Trade Center, LLC

3843369

## CLOSING CERTIFICATE OF SELLER

This Certificate is issued pursuant to that certain Asset Purchase Agreement dated March 4, 2013 (the "**Agreement**"), by and among WORLEY & OBETZ, INC., a Pennsylvania Corporation ("**Purchaser**") and J. W. BISHOP COMPANY, INCORPORATED t/d/b/a BISHOP FUELS, a Pennsylvania corporation ("**Seller**"). Capitalized terms, unless otherwise defined herein, shall have the respective meanings assigned to them in the Agreement. In connection therewith, the undersigned Seller certifies to Purchaser, the following:

1. The conditions set forth in Section 7.2(a) and Section 7.2(b) of the Agreement have been satisfied; and

2. There has not been any material adverse change in the Assets or the Business since December 31, 2012.

IN WITNESS WHEREOF, the undersigned has executed this Certificate and caused the Certificate to be delivered this 4th day of March, 2013.

J. W. BISHOP COMPANY, INCORPORATED

By: _____
Name: _____
Title: _____

3859393

## ADDENDUM

Attached to and made a part of the Asset Purchase Agreement entered into between Worley & Obetz, Inc. and J. W. Bishop, Incorporated, the Real Estate Purchase Agreement entered into between J. W. Bishop Company, Inc. and JW Bishop Properties, LLC, the Real Estate Purchase Agreement entered into between James M. Haggerty and Joseph Haggerty and JW Bishop Properties, LLC, the Residual Agreement entered into between James M. Haggerty and Worley & Obetz, Inc., the Residual Agreement entered into between Joseph Haggerty and Worley & Obetz Inc., and the Promissory Notes entered into between Worley & Obetz, Inc. and J. W. Bishop Company, Incorporated, is the following Addendum which is controlling and supercedes any and all conflicting language contained in the aforesaid documents:

1. Any and all environmental representations made by J. W. Bishop Company, Inc., James M. Haggerty, or Joseph Haggerty refer specifically to actual, personal knowledge of such matter or fact including but not limited to any and all environmental representations made in each of the aforesaid real estate purchase agreements.

2. Any and all references to "environmental conditions" made in the Asset Purchase Agreement refer to the property of third parties who were customers serviced by Seller prior to closing and do not refer to the real estate that is subject to the real estate purchase agreements.

3. If Worley & Obetz, Inc., or their heirs, successors or assigns breaches its obligations under either of the promissory notes or either of the residual agreements, Worley & Orbetz and their heirs, successors or assigns are precluded from enforcing the covenant not to compete described in paragraph 4.7 of the Asset Purchase Agreement.

J.W. Bishop Company, Inc.                    Worley & Obetz, Inc.

_____                    _____

James M. Haggerty                            Joseph Haggerty

_____                    _____

**WORLEY & OBETZ, INC.**
**J.W. BISHOP COMPANY, INCORPORATED**
**Settlement Sheet**
*March 4, 2013*

**PURCHASE PRICE**

| | | |
|---|---|---|
| Cash | | $1,322,000.00 |
| Notes | | $500,000.00 |
| Liquid Inventory | | $68,624.38 |
| Parts Inventory | | $100,775.80 |
|    Truck Parts | $63,838.06 | |
|    HVAC Parts | $36,937.74 | |

**SUBTOTAL**                                             **$1,991,400.18**

**DISTRIBUTIONS**

Customer Credits                    ($260,431.39)

                                               **($260,431.39)**

**TOTAL TO SELLER:**                              **$1,730,968.79**
        **Promissory Notes**                    **($500,000.00)**
**CASH TO SELLER:**                           **$1,230,968.79**

**WORLEY & OBETZ, INC.**

_____
Jeffrey B. Lyons, President

**J.W. BISHOP COMPANY, INCORPORATED**

_____ , President
JAMES M. HAGGERTY